UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

**NOT FOR PUBLICATION**

DEBRA AYYAD-RAMALLO,

             Plaintiff,

**<u>AMENDED MEMORANDUM &
ORDER</u>**

            v.

13-CV-7038 (PKC)

MARINE TERRACE ASSOCIATES LLC,

             Defendant.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Two motions are pending before the Court: (1) Plaintiff Debra Ayyad-Ramallo's motion

for a preliminary injunction; and (2) Defendant Marine Terrace Associates LLC's motion to

dismiss the complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and

12(b)(6).  For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is

granted.

*BACKGROUND*

I.    <u>Factual Background</u>

      Plaintiff, who suffers from diabetes, is a tenant in one of Defendant's Section 8 apartment

buildings in a private residential complex known as Marine Terrace.[1]  (Dkt. 12-2 ¶ 4; Dkt. 24 at

---

[1]  The parties do not directly address whether Defendant qualifies as a "public" entity for
purposes of the Americans with Disabilities Act ("ADA").  Although Defendant seems to
assume that it falls within the ADA's purview, it does not appear that Defendant, a private
landlord, is subject to Title II of the ADA, which applies to public entities.  Likewise, although
Title III of the ADA applies to private entities that operate "places of public accommodation,"
residential facilities, even those that accept public subsidies, do not constitute public
accommodations under Title III.  *See Reid v. Zackenbaum*, 05-CV-1569, 2005 WL 1993394, at

23; Dkt. 20-2.) Plaintiff's lease agreement with Defendant expressly prohibits tenants from keeping dogs or cats as pets. (Dkt. 16-1 at 4.)

At some point while living in her Marine Terrace apartment, Plaintiff got a dog.[2] Defendant allowed Plaintiff to keep the dog as an accommodation for unspecified reasons. (Dkt. 16-11) ("Notably, the investigation revealed that [Defendant] allowed [Plaintiff] to obtain one dog as a reasonable accommodation, but denied her request to obtain a second dog."). On about July 29, 2009, Plaintiff took in a second dog without notifying her building's management. (Dkt. 12-3 at 2; Dkt. 12-3 at 3.) Plaintiff also signed a recertification of her lease in December 2009, in which she stated that she did not have a second dog in the apartment. (Dkt. 16-2.)

On or about March 29, 2010, Defendant was informed by anonymous letter that Plaintiff possessed a second dog in her apartment, and that the dog was disturbing the neighbors. (Dkt. 16-3.) On April 9, 2010, Defendant sent Plaintiff a letter notifying her that she had 10 days within which to cure the violation of the lease by removing the dog, or face eviction. (Dkt. 16-4.) Plaintiff responded on April 12, 2010 with a letter in which she stated that she had acquired the dog on December 1, 2009 and that, as a consequence, any attempt to remove the dog would be in violation of New York City Administrative Code § 27-20091.1 ("NYC Pet Law"). (Dkt. 12-3 at 3; Dkt. 16-5.)[3] The NYC Pet Law provides that a landlord waives its right to remove

---

*4 (E.D.N.Y. Aug. 17, 2005) ("A residential facility, such as an apartment, is not a public accommodation under the ADA."). Nevertheless, as discussed *infra* Section IV.a, the FHA applies to private landlords and generally adopts, with at least one pertinent exception discussed herein, the ADA standard for "reasonable accommodation claims" such as Plaintiff's.

[2] It is unclear when Plaintiff began keeping this dog in the apartment.

[3] Notably, Plaintiff's representation that she acquired the dog on December 1, 2009 conflicts with testimony she subsequently gave in the state court eviction proceedings that she acquired the dog in July 2009. (Dkt. 12-3 at 3.)

pets, even where pets are prohibited, after the tenant has possessed the pet openly and notoriously for 90 days.[4]  Plaintiff's April 12, 2010 letter did not reference Plaintiff's purported disability or state that the second dog was a service or comfort dog.  (Dkt. 16-5.)

## II.  Procedural History in Landlord-Tenant Court

Defendant terminated Plaintiff's lease on May 31, 2010 for failing to remove the second dog from her apartment.  (Dkt. 16-6.)  Defendant initiated a summary holdover proceeding— colloquially, an eviction proceeding—against Plaintiff in Civil Court of the City of New York, Housing Part (the "Housing Court" or "State Court"), on or about June 1, 2010.  (Dkt. 16-7.) Two weeks after the commencement of the summary holdover proceeding to evict Plaintiff, Plaintiff filed a complaint of housing discrimination with the United States Department of Housing and Urban Development ("HUD").  (Dkt. 16-8.)  HUD referred Plaintiff's complaint to the New York State Division of Human Rights ("DHR") for investigation.  (Dkt. 16-8.)  On or about July 13, 2010, Plaintiff filed a separate complaint with the DHR alleging unlawful discrimination for failing to allow her to keep the second dog in her apartment as a reasonable accommodation.  (Dkt. 16-9.)  The DHR investigated Plaintiff's claims, and on or about October 26, 2010, issued its determination, which concluded that Plaintiff's claims were unsubstantiated and found no probable cause that discrimination had occurred.  (Dkt. 16-11.)

On or about December 10, 2010, while the eviction proceeding was pending, Plaintiff initiated a proceeding pursuant to Article 78 of the New York Civil Practice Laws and Rules challenging the DHR's determination that no discrimination had occurred.  (Dkt. 16-13.)  In response to Plaintiff's Article 78 filing, Defendant stipulated to stay the eviction proceeding until

---

[4] The NYC Pet Law is aimed at "preventing abuses in the enforcement of covenants prohibiting the harboring of household pets and preventing the retaliatory eviction of pet owners for reasons unrelated to the creation of a nuisance."  *Bd. of Managers v. Lamontanero*, 206 A.D.2d 340, 340 (2d Dep't 1994).

the conclusion of the Article 78 action. (Dkt. 16 ¶ 25.) Ultimately, Plaintiff's Article 78 action was dismissed by the Appellate Division due to Plaintiff's failure to perfect her appeal in a timely manner. (Dkt. 16-17.)

Defendant then re-commenced the holdover proceeding. (Dkt. 16 ¶¶ 25, 30.) In a summary judgment order, dated September 17, 2013, the Housing Court dismissed all of Plaintiff's affirmative defenses, with the exception of her affirmative defense related to the NYC Pet Law's 90-day waiver provision, because Plaintiff claimed that she had maintained the second dog in her apartment openly and notoriously for more than 90 days. (Dkt. 16-18 at 2; Dkt. 16-19.) The State Court rejected Plaintiff's affirmative defense that she had been discriminated against based on her disability because *res judicata* barred the court's reconsideration of the findings of the DHR. (Dkt. 16-18 at 2.) Later, following a trial only on Plaintiff's NYC Pet Law defense, the court denied Plaintiff's defenses and entered an eviction order. (Dkt. 16-19.) The court suspended the issuance of a warrant for Plaintiff's eviction for approximately six weeks to permit Plaintiff to permanently remove the second dog from the premises. (Dkt. 16-19 at 3.) Plaintiff did not appeal from that order.

III.    Procedural History Before This Court

On approximately December 6, 2013, four days prior to entry of the eviction order, Plaintiff, then proceeding *pro se*, initiated the instant action. (Dkt. 1.) Plaintiff's complaint states, in its entirety:

> The jurisdiction of the court is invoked pursuant to that the defendant is violating my civil rights due to my disability. The defendant is attempting to evict me from my premises because of my service dog. I wrote a letter to the defendant asking for pet accom[m]odation due to my disability. The remedy I am seeking is to remain in my apartment with my service dog.

(Dkt. 1.)

On January 30, 2014, approximately seven weeks after commencement of the instant action and only one day before the deadline in the eviction order, Plaintiff, now represented by counsel, moved, pursuant to the ADA and the Fair Housing Act ("FHA"), for a temporary restraining order ("TRO") to prevent Defendant from evicting her. (Dkt. 7-2.)

On February 3, 2014, the Court held a hearing on Plaintiff's TRO motion. At the conclusion of the hearing, the Court granted Plaintiff's request for a TRO, and set a briefing schedule in connection with her preliminary injunction motion and Defendant's motion to dismiss the complaint. (*See* February 3, 2014 Minute Entry.) The Court granted the TRO based upon Plaintiff's showing that her dog may have been serving as a service animal who alerted Plaintiff, who is a diabetic, when her blood sugar became low. The TRO was necessary because Plaintiff faced imminent eviction from her apartment, and the Court required adequate time to consider Plaintiff's preliminary injunction motion. (*See* Dkt. 7-1 at ECF at 5–6 (State Court order of eviction).)[5] The Court noted that it was granting the TRO even though the urgency was almost entirely self-inflicted by Plaintiff, but that the equities nonetheless tipped in Plaintiff's favor and justified issuing the TRO. (TRO Hearing Transcript at 66–67.)

The parties' respective motions were fully briefed by May 8, 2014.

*DISCUSSION*

I.  <u>Preliminary Injunction Standard</u>

Generally, the purpose of a preliminary injunction is to maintain the status quo until the Court can render a determination on the merits of the plaintiff's claims. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "In order to justify a preliminary injunction, a movant

---

[5] Citations to "ECF" pages refer to the page numbering of the Electronic Court Filing ("ECF") system, and not the document's internal pagination.

must demonstrate (1) irreparable harm absent injunctive relief; and (2) 'either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.'" *Donohue v. Mangano*, 886 F. Supp. 2d 126, 149 (E.D.N.Y. 2012) (citing *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *Almontaser v. N.Y. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008)).

II.     The *Rooker-Feldman* Doctrine

Defendant primarily argues that Plaintiff cannot demonstrate a likelihood of success on the merits of her claims because the so-called *Rooker-Feldman* doctrine deprives this Court of subject matter jurisdiction to entertain Plaintiff's claims. (Dkt. 18 at 11–12.)

Under the *Rooker-Feldman* doctrine, federal district and circuit courts lack subject-matter jurisdiction over cases that essentially are appeals from state-court judgments. *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that *Rooker-Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"). The Supreme Court has described the *Rooker-Feldman* doctrine as occupying "narrow ground" and applies only in "limited circumstances." *See Exxon Mobil*, 544 U.S. at 287, 291.

The *Rooker-Feldman* doctrine applies where a four-prong test is satisfied: (1) the federal court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state-court judgment; (3) the plaintiff invites district court review and rejection of that judgment; and (4) the state-court judgment was rendered before the district court proceedings commenced. *Green v.*

*Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009). Here, the Court finds that Plaintiff's claims are not barred by the *Rooker-Feldman* doctrine. Although many of the factors and considerations of the *Rooker-Feldman* doctrine are present here, *Rooker-Feldman* is inapposite for one simple reason: the state-court judgment of eviction was not rendered before the district court proceedings commenced.

On December 10, 2013, the Housing Court issued its judgment ordering that Plaintiff could be evicted. (Dkt. 16-19 at 3.) Plaintiff had filed the instant lawsuit four days earlier, on December 6, 2013. (Dkt. 1.) Plaintiff's initiation of this action prior to the issuance of the state-court judgment renders these proceedings parallel and not subject to the *Rooker-Feldman* bar. *See Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 23–24 (1st Cir. 2005) (citing *Exxon Mobil*, 544 U.S. at 291) ("If federal litigation is initiated *before* state proceedings have ended, then—even if the federal plaintiff expects to lose in state court and hopes to win in federal court—the litigation is parallel, and the *Rooker-Feldman* doctrine does not deprive the court of jurisdiction."); *Hoblock*, 422 F.3d at 85 ("*Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.").[6] Accordingly, Defendant cannot meet the fourth prong of the *Rooker-Feldman* test.

---

[6] There is some confusion as to the circumstances under which *Rooker-Feldman* applies to interlocutory orders that do not finally resolve the state litigation, such as the Housing Court's September 17, 2013 summary judgment order. *See Hoblock*, 422 F.3d at 89; *see also Federacion de Maestros de Puerto*, 410 F.3d at 22–24 (discussing application of *Rooker-Feldman* to interlocutory orders). Although it is well established that *Rooker-Feldman* generally bars federal district and circuit courts from reviewing purely interlocutory orders—because it would make little sense to forbid those courts from reviewing final orders under *Rooker-Feldman* while permitting review of interlocutory orders—the central inquiry is whether "the state proceedings [have] ended" by the time the federal court is called upon. *Hoblock*, 422 F.3d at 89; *Federacion de Maestros de Puerto Rico*, 410 F.3d at 23–24 (citing *Exxon Mobil*, 544 U.S. at 291). That is the case here. The Housing Court's September 17, 2013 summary judgment

Defendant attempts to characterize the state-court judgment challenged by Plaintiff as the Housing Court's earlier summary judgment order, in which the court rejected Plaintiff's affirmative defenses, including that she was disabled and that her dog was a service animal. (*See* Dkt. 18 at 7–8.) Defendant argues that the summary judgment order, issued by the Housing Court on September 17, 2013, is the order that Plaintiff challenges for purposes of the *Rooker-Feldman* inquiry. (Dkt. 18 at 7–8, 13.) That argument is incorrect.

The Housing Court's summary judgment order did not cause Plaintiff injury because it did not order that Plaintiff be evicted. Rather, it rejected Plaintiff's affirmative defenses—*i.e.*, prevented Plaintiff from winning the case without a trial—and ordered a trial on the factual issue of whether Plaintiff maintained her dog openly and notoriously, which, if proven, would have prevented Plaintiff's eviction by operation of the NYC Pet Law. (Dkt. 16-18 at 3.) In short, the injury of which Plaintiff complains and seeks to have this Court remedy is her eviction. That eviction was not ordered until December 10, 2013, four days after Plaintiff initiated this action. (Dkt. 16-19.) Consequently, *Rooker-Feldman*, which occupies "narrow ground" and is to be construed narrowly, does not deprive this Court of subject matter jurisdiction over Plaintiff's claims.[7] Accordingly, the Court proceeds to the merits of Plaintiff's claims in connection with her motion for a preliminary injunction.

---

order did not end the case for purposes of *Rooker-Feldman*; the December 10, 2013 order of eviction did. Thus, there is no question in this case that the federal and state court proceedings are                                                                                                                        parallel.

[7] An even narrower "exception to the exception" applies where "the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions [] remain to be litigated." *See Federacion de Maestros de Puerto Rico*, 410 F.3d at 24–25. There is no evidence that the state court, in dismissing Plaintiff's affirmative defenses of disability, evaluated those defenses under the ADA or FHA. The summary judgment order does not reference those statutes, and it appears the order only dismissed Plaintiff's claims, which were rejected by the DHR, on the state law ground of *res judicata*. (Dkt. 16-18.) Accordingly,

III.     Irreparable Harm

Irreparable harm means "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113–14 (2d Cir. 2003). Generally, eviction from one's home constitutes irreparable injury. *See In re Slater*, 200 B.R. 491, 495 (E.D.N.Y. 1996) ("The parties do not seriously deny that [plaintiff] will suffer irreparable harm if she is evicted from her home."); *Bosch v. Lamattina*, (E.D.N.Y. Nov. 4, 2008) ("It is clear that Plaintiff faces irreparable harm in the absence of injunctive relief. Courts have found in certain circumstances that the 'threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test of preliminary injunctive relief.'") (citation omitted and collecting cases). The parties do not dispute this, and indeed, Defendant, for purposes of the instant motion, acknowledges that eviction may constitute irreparable harm. (Dkt. 18 at 10 n.9.) Accordingly, the Court finds that Plaintiff has established the irreparable harm prong of the inquiry.

IV.     Likelihood of Success on the Merits

A party seeking a preliminary injunction may satisfy the likelihood of success prong either by demonstrating that the party has a "likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

---

the Court does not find that the Housing Court "finally resolved all the federal questions in the litigation," leaving only "state law or purely factual questions" to be litigated.

a.  The ADA and the FHA

Although Plaintiff's complaint is unclear as to the precise legal basis of her claims, her subsequent TRO and preliminary injunction submissions generally invoke the protections of the ADA and FHA.  (Dkt. 7-2.)   Because "reasonable accommodation claims" are the same whether analyzed under the ADA or the FHA, with some exceptions, the Court generally may consider Plaintiff's ADA and FHA claims in tandem.  *See Smith v. New York City Housing Auth.*, 410 Fed. App'x 404, 406 (2d Cir. 2011) (summary order) (citing *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003)) ("The FHA and the ADA impose similar anti-discrimination standards for persons who suffer from disabilities and, due to their similarities, can be analyzed 'in tandem.'").[8]  Accordingly, the Court analyzes Plaintiff's FHA claims under the ADA's rubric, with the exception of the FHA definition of service animal, as discussed *infra* Section IV.c.

With respect to the second prong of the ADA inquiry, the ADA does not apply to private landlords, even if the premises are used for publicly subsidized housing.   *See Reid v. Zackenbaum*, 05-CV-1569, 2005 WL 1993394, at *4 (E.D.N.Y. Aug. 17, 2005) ("A residential facility, such as an apartment, is not a public accommodation under the ADA.").  However, the FHA's provisions apply to private landlords.  Section 3604(f) of the FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter," or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the

_____

[8] *See also Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 (2d Cir. 2002) (abrogated by statute on other grounds) ("A [defendant] discriminates in violation of the FHA, the ADA, or the Rehabilitation Act if it refuses to make changes to traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.") (quotations omitted).

provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person." 42 U.S.C. § 3604(f)(1)–(2). Establishing a claim of discrimination under the FHA for failing to make a reasonable accommodation requires a plaintiff to show that "(1) [s]he suffers from a handicap as defined by the FHA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Bentley v. Peace & Quiet Realty 2 LLC*, 367 F. Supp. 2d 341, 345 (E.D.N.Y. 2005).[9]

   b.  Disability

   As with the ADA, a person is qualified as disabled under the FHA where the person has "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities;" or (2) "a record of having such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 3602(h). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Missick v. City of New York*, 707 F. Supp. 2d 336, 252 (E.D.N.Y. 2010) (citing 29 C.F.R. § 1630.2(i)); *see also Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) (defining and describing "substantial limitation of major life activity"); 24 C.F.R. § 100.201. Importantly, "not every impairment that affect[s] an individual's major life activities is a substantially limiting impairment." *Ryan*, 135 F.3d at 870 (citing *Roth v. Lutheran Gen. Hosp.*,

---

[9] The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a violation of the ADA, a plaintiff must show that: (1) she is a "qualified individual" with a disability, (2) that the defendant is subject to the ADA's provisions, and (3) that she was denied an opportunity or benefit from the services provided by the defendant or that she was discriminated against due to her disability. *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

57 F.3d 1446, 1454 (7th Cir. 1995)). A plaintiff "must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,'" and then "must show that her impairment 'substantially limits' the major life activity previously identified." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (quoting *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998)). To demonstrate that she suffers from a physical impairment limiting a major life activity, "a plaintiff cannot rely on 'conjecture or surmise,' and 'must do more than simply show that there is some metaphysical doubt as to the material facts'" surrounding her alleged disability. *Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (internal citations omitted) & *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Plaintiff has not demonstrated a likelihood of success of establishing that she suffers from a disability under the ADA or FHA. First, Plaintiff's submissions conclusorily assert that she is "disabled." (*See* Dkt. 12-1 at 1–2.) Although Plaintiff states that she has diabetes, she identifies no activity, no less a "major life activity," that she claims to be impaired by her diabetic condition. Nor does any evidence in the record suggest as much. Plaintiff's doctor states that Plaintiff "suffers from Diabetes, High cholesterol, Depression, and severe Anxiety." (Dkt. 24 at 23.) This diagnosis may be accurate, but it fails to set forth if or how any of Plaintiff's conditions "substantially limits" a major life activity.

Nor does Plaintiff's testimony at the TRO hearing demonstrate that she is likely to establish that she is disabled under the ADA or FHA. Plaintiff testified that, among other life activities, she regularly walks her dogs, works seven days a week as a home health aide, and commutes to work daily via public transportation. (*See* Dkt. 18 at 15 & accompanying citations.) Plaintiff's ability to perform these functions significantly demonstrates that she is not

substantially limited in her major life activities. Indeed, Plaintiff has failed to offer evidence that she suffers from a condition that substantially limits any major life activity, despite the Court's advice at the TRO hearing that she should do so in connection with her preliminary injunction motion. (*See* Dkt. 18 at 15 n.11.) Moreover, the Court at the hearing asked Plaintiff about her anxiety, and how it affected her life. Plaintiff only responded that "I work disabled." (Dkt. 17-3 at 18.) Plaintiff then testified that she was not certified as being disabled to work, and that she indeed maintained a full-time job as a home health aide. (Dkt. 17-3 at 19.) The Court then asked Plaintiff "So, none of the conditions that you mentioned earlier, though, have prevented you from working; is that right?" (Dkt. 17-3 at 20.) Plaintiff's indirect response that followed was only that she experienced effects of diabetes, but not that she was substantially limited in any way. (Dkt. 17-3 at 20.)

On a preliminary injunction motion, where Plaintiff bears the burden of demonstrating a likelihood of success, Plaintiff has not carried her burden. In light of the above testimony and evidence, the Court finds that Plaintiff has not established a likelihood of success in proving that she is a qualified person under the ADA or FHA.[10]

---

[10] Although the DHR flatly stated that Plaintiff is disabled, it did not explain the basis for this conclusion or identify the standard or legal provision applied in evaluating Plaintiff's claim of disability. (*See* Dkt. 16-11) ("The investigation revealed that [Plaintiff] is disabled. However, the investigation did not reveal that [Plaintiff] requires a second dog as an emotional support animal that enables [Plaintiff's] use and enjoyment of the Premises."). The DHR's finding that Plaintiff did not need a second dog as an "emotional support animal" suggests that the disability claimed by Plaintiff in the DHR proceeding was her anxiety and/or depressive condition, not her diabetes. There is no indication that the DHR considered the ADA or FHA when it stated that Plaintiff is disabled, so the Court is unable to conclude that the DHR found that Plaintiff suffered from a condition that limited a major life activity. Accordingly, the DHR finding does not have collateral estoppel effect, and the Court is not bound by its determination. *See infra* Section IV.c.i (discussing collateral estoppel).

### c. Reasonable Accommodation – Service Dog

Even assuming, *arguendo*, that Plaintiff was able to establish that she qualifies as disabled under the ADA or FHA, Plaintiff also fails to show a likelihood of success of demonstrating that keeping a second dog in her apartment constitutes a reasonable accommodation and that Defendant failed to reasonably accommodate her.

The FHA provides that housing providers must make "reasonable accommodations" to "rules, policies, practices or services when such accommodation may be necessary to afford [the disabled person] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

Although Plaintiff fails to clearly articulate the basis for her claim that allowing her to keep a second dog constitutes a reasonable accommodation (*see* Dkt. 12-1 at 9–10), based upon testimony adduced at the TRO hearing, the Court liberally construes her claim to be that the second dog—in contrast to her first dog—constitutes a service animal with respect to Plaintiff's diabetic condition because the dog alerts her to drops in her blood sugar level. The Court, however, finds that Plaintiff has not established a likelihood of success on the merits for this claim.

### i. Collateral Estoppel

At the outset, Defendants argue that the Housing Court's determination that Plaintiff's second dog was not a service animal is entitled to collateral estoppel effect. (Dkt. 18 at 17–18.) For Plaintiff to be collaterally estopped from re-litigating whether her dog is a service animal, four requirements must be satisfied: (1) The identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir.

2013) (citing *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply [collateral estoppel]." *Id.* (citing *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996)).

At this juncture, the Court declines to collaterally estop Plaintiff from asserting that her dog is a service animal for one primary reason relating to the second prong of the inquiry: it is not clear that the Housing Court resolved the same issue now before the Court. In neither its summary judgment or eviction order does the Housing Court indicate the basis for its finding that Plaintiff's second dog is not a service animal, nor did the Housing Court state whether it considered the standards for a service dog under federal statutes, such as the ADA or the FHA. In addition, it is not clear from the record what type of service Plaintiff claimed her second dog provided in the Housing Court proceeding, *i.e.*, emotional support versus blood sugar detection. Accordingly, at this stage of the litigation, the Court declines to find that the state-court judgment that Plaintiff's dog is not a service animal is entitled to collateral estoppel effect.[11]

     ii.     <u>Plaintiff Has Not Demonstrated a Likelihood of Success<br>that her Second Dog Qualifies as a Service Animal</u>

It appears that Plaintiff has previously claimed that her second dog serves as an emotional support animal. The DHR found that "the investigation revealed that [Plaintiff], who is disabled, requested that [Defendant] allow [Plaintiff] to have a second dog reside in the [apartment] as an emotional support animal in addition to [Plaintiff's] first dog." (Dkt. 16-11 at 2.) The DHR

---

[11] Additionally, it is unclear whether Plaintiff had a full and fair opportunity to litigate the issue of her service dog in the Housing Court action. *See Proctor*, 715 F.3d at 414. For example, Plaintiff claimed during the TRO hearing that the Housing Court judge did not properly consider evidence she presented, which could have deprived her of a full opportunity to present evidence or call witnesses in that proceeding. (Dkt. 17-3 at 41–42.) It is not necessary to address this issue, however, as Plaintiff does not raise it, and the Court is not applying collateral estoppel in any event.

found that there was no basis to find that "[Plaintiff] requires a second dog as an emotional support animal that enables [Plaintiff's] use and enjoyment of the [apartment]." (Dkt. 16-11 at 3.) Plaintiff, however, did not refer to an emotional support animal in her *pro se* complaint in this case; she merely claimed that Defendant was evicting her because of her "service dog" and that she wished to remain in her apartment with her "service dog." (Dkt. 1.)

Emotional support or comfort animals do not qualify as service animals under the ADA. "An animal that simply provides comfort or reassurance is equivalent to a household pet, and does not qualify as a service animal under the ADA." *Rose v. Springfield-Green Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1215 (W.D. Mo. 2009) (quoting *Baugher v. City of Ellensburg*, 06-CV-3026, 2007 WL 858627, at *5 (E.D. Wash. Mar. 19, 2007)). The ADA's regulations provide that "[t]he crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition." 28 C.F.R. § 36.104. Thus, with respect to her ADA claim, Plaintiff must establish that her second dog provides a service other than emotional support.[12]

Emotional support animals, however, may qualify for protection under recently promulgated FHA rule interpretations. A notice released by HUD on April 25, 2013 provides that ADA regulations excluding emotional support animals from the definition of service animal do not apply to the FHA. U.S. Department of Housing and Urban Development, *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded*

---

[12] Although the precise grounds of her challenge are unclear, Plaintiff challenged the DHR's findings in an Article 78 petition. She did so, at least in part, on the basis that the DHR failed to consider whether her dog could constitute a service animal as defined under the ADA, rather than a mere comfort dog. (Dkt. 16-13) (Plaintiff argued: "Conclusively speaking, the decision of the [DHR] that denied [Plaintiff] of her rights to own a second dog was not supported by the evidence that it reviewed because the [Plaintiff's] doctor[] communicated the [Plaintiff's] *psychological and medical* basis for a second dog.") (emphasis added).

*Programs*, April 25, 2013 ("HUD Notice").[13]  The HUD notice specifically provides that the ADA provision "does not limit housing providers' obligations to make reasonable accommodations for assistance animals under the [FHA] or [Rehabilitation Act.]"  Therefore, Plaintiff could seek to establish that her second dog qualifies as an emotional support animal for purposes of the FHA.[14]

Section 36.104 of the ADA regulations, which apply to both ADA and FHA claims, provide that, to qualify as a service dog, the animal must be "individually trained to do work or perform tasks for the benefit of an individual with a disability."  28 C.F.R. § 36.104. Additionally, "[t]he work or tasks performed by a service animal must be directly related to the individual's disability."  *Id.*

As discussed, it appears that Plaintiff is claiming in this action that her second dog qualifies as a service dog because it alerts her when her blood sugar level drops.  With respect to the dog's training, the primary evidence Plaintiff has submitted is a certificate prepared by her dog's trainer.  The certificate, however, merely states that her second dog "has demonstrated that he is able to perform those tasks required to assist her handler."  (Dkt. 12-4 at 2.)  The certification contains no information about what training the dog underwent, what tasks the dog performs, or in what ways performance of those tasks assists Plaintiff in connection with her alleged disability.  This evidence is insufficient to demonstrate that Plaintiff is likely to succeed on the merits of her claim that her dog is a service animal as defined by ADA regulations.

---

[13]  The HUD Notice is available at http://portal.hud.gov/hudportal/documents/huddoc?id =servanimals_ntcfheo2013-01.pdf.

[14] Notably, however, Plaintiff's does not argue that her dog provides emotional support.  Rather, the only basis of her motion, and her testimony at the TRO hearing, is that her dog provides assistance by alerting her to her low blood sugar, not that it provides emotional support.  (*See* Dkt. 24 ¶ 4.)

The testimony of Plaintiff's dog trainer, Frank Cahill, at the TRO hearing is equally unavailing. Cahill testified that a dog cannot be trained to alert an owner to low blood sugar. (Dkt. 17-3 at 54.) Cahill also testified that Plaintiff sought certification at least in part because she said the dog could sense Plaintiff's anxiety issues and would "jump up on her lap and comfort her, lick her, things like that[.]" (Dkt. 17-3 at 55.) Critically, Cahill testified that he did not train the dog in connection with its purported ability to sense and alert to low blood sugar, but rather trained the dog regarding "obedience training and behavior modification." (Dkt. 17-3 at 56.) These are not the tasks of an ADA-eligible service animal, and the second dog has not otherwise been trained to perform the functions of a service animal. Thus, Plaintiff's dog cannot qualify as a service animal under the ADA on this ground.[15]

Although Plaintiff has not argued for protection of her second dog as an emotional support animal under the FHA in this case, the Court finds that such a claim also would fail. To qualify as a service animal under the FHA, an emotional support animal must "provid[e] emotional support to persons with disabilities who have a *disability-related need for such support*." HUD Notice at 2 (emphasis added). As discussed above, Plaintiff has failed to demonstrate a likelihood of success in showing that she qualifies as disabled under the ADA; that definition also applies to disability claims under the FHA.[16] Plaintiff likewise has failed to

---

[15] The FHA does not define the term "service animal," and instead generally adopts the ADA definition. However, HUD rules provide that, under the FHA, "animals that are necessary as a reasonable accommodation do not *necessarily* need to be trained or meet certification requirements." *Pet Ownership for the Elderly and Persons with Disabilities*, 73 FR 63834-01 (Oct. 27, 2008) (emphasis added).

[16] The HUD Notice makes clear that the FHA "do[es] not require a modification to a [housing] provider's 'no pets' policy, and the reasonable accommodation request may be denied" when a resident fails to demonstrate a "disability – *i.e.*, a physical or mental impairment that substantially limits one or more major life activities[.]" HUD Notice at 3.

articulate how, if she is disabled, she has a "disability-related need" for support from an emotional support animal, or how a *second* dog is needed to provide that support. (*See* Dkt. 16-11 at 3) (DHR finding no basis for Plaintiff's contention that she "requires a second dog as an emotional support animal" to enable her to use and enjoy her apartment); 42 U.S.C. § 3604(f)(3)(B) (housing providers must make "reasonable accommodations" to "rules, policies, practices or services when such accommodation may be necessary to afford [the disabled person] equal opportunity to use and enjoy a dwelling."). Accordingly, Plaintiff has not demonstrated a likelihood of success in establishing that her second dog qualifies for protection under the FHA.

Lastly, the Court finds that Plaintiff's contention that her second dog is a service animal lacks credibility because: (1) she did not disclose the dog's presence to Defendant when she first obtained the dog, let alone that she considered the dog to be a service animal; (2) she did not at first describe the dog as a service animal in her correspondence with Defendant when challenged on the dog's presence; and (3) Plaintiff has never claimed that she obtained the dog in the first instance to serve as a service animal.[17] Furthermore, Plaintiff has never claimed or even suggested that, without her dog, she would be unable to properly monitor her blood sugar levels, or that she has ever had difficulty doing so. Rather, Plaintiff's claim that her second dog is a service animal appears to be a *post hoc* rationalization for having the dog, in violation of her lease. There simply is no persuasive evidence in the record that Plaintiff considered her dog to be a service dog for her diabetes until her HUD/DHR complaint of June 14, 2010, nearly a year after she obtained the dog and shortly after Defendant initiated eviction proceedings against

---

[17] Indeed, Plaintiff testified at the eviction proceeding that she initially acquired the second dog as a pet. (Dkt. 17-3 at 24:6–19, 25:8–11.)

her.[18]  This timeline, at the very least, calls into question Plaintiff's credibility with respect to her claims that she viewed her dog to be a service animal prior to Defendant's attempts to evict her.

   d. <u>Disparate Impact Theory</u>

  Plaintiff appears to make a separate claim that Defendant's alleged discrimination has a disparate impact on a protected group, *viz.*, people with disabilities.  (Dkt. 12-1 at 7) ("First, defendants' [sic] conduct obviously has a greater adverse impact on handicapped individuals than on non-handicapped individuals.")  "To establish a prima facie case under this theory, the plaintiff must show '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'"  *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003) (citing *City of Middletown*, 294 F.3d at 52–53) (emphasis omitted). Plaintiff has submitted no evidence that Defendant's no-pet policy has a "significantly adverse or disproportionate impact on persons of a particular type" or that such an impact, were it present, is caused by Defendant's no-pet policy.  Accordingly, Plaintiff has not established a likelihood of success on the merits of her disparate impact discrimination claim.

   e. <u>Sufficiently Serious Questions</u>

  Where a plaintiff fails to demonstrate a likelihood of success on the merits, a preliminary injunction may nonetheless be warranted where the plaintiff establishes *both* that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

---

[18] Had Plaintiff in good faith considered her dog to be a service animal, she could have notified Defendant when she obtained the dog or upon her lease certification.  Instead, Plaintiff hid the presence of the dog, in full knowledge of Defendant's no-pet policy—she already had been given an accommodation for her first dog.  Then, when the second dog was discovered, Plaintiff did not at first contend the dog was a service animal, but rather only argued that it was exempt from removal under the NYC Pet Law's 90-day waiver provision.

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). Here, for the same reasons as set forth above, Plaintiff has failed to demonstrate sufficiently serious questions going to the merits of her case.

V.     Motion to Dismiss

To withstand a motion to dismiss pursuant to FRCP 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The liberal notice pleading standard of FRCP 8(a) only requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 570. Under FRCP 8(a)(2), the complaint need not set forth "detailed factual allegations," but the plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* In evaluating a 12(b)(6) motion to dismiss, the district court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006). Nevertheless, a complaint must contain enough factual material to "'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570), and a complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. That "it may appear on the face of the pleadings that a recovery is very remote and unlikely[,] . . . is not the test." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (citing *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)).

Here, even liberally construing Plaintiff's *pro se* complaint, as it must, the Court finds that the complaint lacks adequate factual detail to state a claim. *Sykes v. Bank of Am.*, 723 F.3d

399, 403 (2d Cir. 2013) ("Pro se complaints must be construed liberally and interpreted to raise the strongest arguments that they suggest."). Plaintiff, initially proceeding *pro se*, submitted a bare-bones complaint in which she alleged she was being discriminated against in her housing on the basis of her disability and that she wished to remain in her home with her service animal. Plaintiff's complaint, which consists of four sentences, lacks adequate factual material to establish that she qualifies as a disabled person under the ADA or the FHA, and, for that matter, fails to set forth the law pursuant to which she brings suit. Plaintiff's complaint also fails to set forth adequate factual material to establish that permitting her to keep the second dog in her apartment constitutes a reasonable accommodation because it provides her a service in connection with a disability. Simply put, Plaintiff's complaint is inadequate to give Defendant fair notice of the nature of her claims and the grounds upon which her claims rest. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

It is within the Court's discretion to grant leave to amend the complaint. *See Lucente v. Int'l Business Machines Corp.*, 310 F.3d 242, 258 (2d Cir. 2002). Ordinarily, the Court would dismiss Plaintiff's complaint without prejudice and grant her leave to amend. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated") (internal quotation and citation omitted); *see also* FRCP 15(a)(2) (leave to amend the complaint "shall be freely given when justice so requires"). However, where the Court finds that amendment of the complaint would be futile, leave need not be granted. *See Lucente*, 310 F.3d at 258 ("One appropriate basis for denying leave to amend is that the proposed amendment is futile.").

The Court finds that leave to amend would be futile in this case. Through the TRO and preliminary injunction proceedings, which included an evidentiary hearing at which Plaintiff and the dog trainer, Mr. Cahill, testified, Plaintiff had the opportunity to fully amplify her ADA and FHA claims and the factual allegations supporting those claims. Moreover, Plaintiff, through counsel, has fully briefed her preliminary injunction motion, which contains several exhibits. However, based on the record established through these proceedings, the Court finds both (1) that Plaintiff has failed to state a plausible claim that she is entitled to keep her second dog as a reasonable accommodation under the ADA or FHA, and (2) that permitting her to amend her complaint would be futile, because Plaintiff has failed to raise a triable issue of fact. *Cf. Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 118–19 (E.D.N.Y. 2011) ("Usually, a proposed amendment is futile if it could not survive a Rule 12(b)(6) motion to dismiss for failure to state [a] claim. But, when a motion to amend is made in response to a summary judgment motion, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact, even if the amended complaint would state a valid claim on its face.") (citing cases). The circumstances here are substantially similar to a motion for summary judgment to fall within the circumstances of *Alexander*. Plaintiff was afforded considerable opportunity to demonstrate the viability of her claims in connection with the TRO hearing and subsequent briefing on the preliminary injunction motion. Through these proceedings, however, Plaintiff has not demonstrated that amendment of the complaint would be productive. *See Ruffolo*, 987 F.2d at 131 ("Where it appears that granting leave to amend is unlikely to be productive, [] it is not an abuse of discretion to deny leave to amend.") (citing *Foman v. Davis*, 371 U.S. 178, 183 (1962)); *see also Corbett v. City of New York*, 11-CV-3549(CBA), 2013 WL 5366397, at *4 (E.D.N.Y. Sept. 24,

2013) (noting that leave to amend would be futile where the court found that plaintiff failed to raise a genuine issue of fact following the denial of plaintiff's motion for a preliminary injunction); *Williams v. Calderoni*, 11-CV-3020, 2012 WL 691832, at *8 (S.D.N.Y. Mar. 1, 2012) (denying leave to amend where plaintiff had "multiple opportunities to allege sufficient specific facts to render his claims plausible, including in the Amended Complaint, at the preliminary injunction hearing, and in his papers opposing the instant motion, and failed to do so"). Accordingly, the Court finds that, despite ample opportunity to do so, Plaintiff has failed to demonstrate that amendment of the complaint would be productive, and dismisses Plaintiff's complaint with prejudice.

## CONCLUSION

For the reasons stated above, Plaintiff has failed to establish her entitlement to a preliminary injunction enjoining Defendant from evicting her or removing the second dog from her apartment. Therefore, the TRO entered at the January 31, 2014 hearing hereby is VACATED and Plaintiff's motion for a preliminary injunction is DENIED.

Because Plaintiff has failed to plausibly state a claim for relief under the ADA or FHA with respect to her second dog, Defendant's motion to dismiss is granted, and Plaintiff's complaint is dismissed. Furthermore, based on the Court's finding that granting Plaintiff leave to amend her complaint would be futile, the complaint is dismissed with prejudice, and the Clerk of Court respectfully is directed to close this case.

SO ORDERED:

_____/s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge

Dated: July 2, 2014
         Brooklyn, New York